Doreene **MASONHEIMER**

v.

**COLONIAL PENN INSURANCE COMPANY.**

**Civil Action No. 96–5467.**

United States District Court, E.D. Pennsylvania.

April 17, 1997.

Terrence J. Schade, C. Wesley Kuehnle, Schade and Edwards, P.C., Philadelphia, PA, Peter John Williams, Philadelphia, PA, for Plaintiff.

Sharon M. Erwin, Gollatz, Griffin, Ewing & McCarthy, Philadelphia, PA, for Defendant.

### MEMORANDUM

PADOVA, District Judge.

Plaintiff, Doreene Masonheimer, brings this action against her former employer, Colonial Penn Insurance Company, for age and sex discrimination and for discrimination on the basis of disability. Before the Court is Defendant's Motion for Summary Judgment. For the reasons that follow, the Motion is granted.

### I. Facts

Plaintiff, a 49 year-old white female, began working for Defendant in 1978 and over the years held a series of positions with increasing responsibility. In 1991, while on a business trip to California, Plaintiff experienced three epileptic seizures, as a result of which she was hospitalized and forced to miss a week of work. Notwithstanding her condition, for which she received medical treatment, Plaintiff continued to work for Defendant. Between late 1993 and early 1994,

Plaintiff switched job titles from Senior Property Claims Examiner, in which capacity she reported to Patricia Bingham, to Home Office Consultant (Property), in which capacity she reported to James Ackroyd. As a Home Office Consultant (Property), Plaintiff's salary grade was 17. Plaintiff contends that her epilepsy was aggravated by the fact that Mr. Ackroyd would occasionally yell at her. Plaintiff claims that she advised Mr. Ackroyd of the fact that his periodic screaming exacerbated her epilepsy and asked him to cease.

Defendant contends that by the summer of 1994, the insurance claims referred to the Home Office from its homeowner/property business declined to the point where it became uneconomical to retain the position of Home Office Consultant (Property), which was dedicated to processing homeowner/property claims. Instead, Defendant decided to shift responsibility for auditing homeowner claims from the Home Office to the field' offices. On June 28, 1994, Mr. Ackroyd informed Plaintiff that her current position was to be eliminated as of July 19, 1994, at which point she was to be transferred to the Automobile Insurance Plan Claim Unit ("AIP Unit"). In her new position, Plaintiff would retain the same salary, though her salary grade was to drop to 16.

On July 6, 1994 Plaintiff became ill and unable to report to work. At the time this suit was filed, Plaintiff had still not returned to work. In November 1994, Plaintiff filed an action with the Federal Equal Employment Opportunity Commission ("EEOC") and a parallel action with the Pennsylvania Human Relations Commission. Plaintiff received Notice of Right to Sue from the EEOC on July 26, 1996.

Plaintiff contends that the transfer announced on June 28, 1994 from Home Office Consultant (Property) to the AIP Unit was a demotion motivated by sex, age and disability discrimination. Plaintiff presents claims under the: (1) Age Discrimination in Employment Act, 29 U.S.C.A. §§ 621–634 (West 1985 and Supp.1996) ("ADEA") (Count I); (2) Civil Rights Act, 42 U.S.C.A. §§ 2000(e)(e)(17) (West 1994 and Supp.1996) ("Title VII") (Count II) and; (3) Americans with Disabilities Act, 42 U.S.C.A. §§ 12101–12213 (West 1995) ("ADA") (Count III). Plaintiff seeks backpay, front pay, lost pension benefits, compensatory and punitive damages, costs and attorneys' fees.

## II. Legal Standard

Fed.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if there is sufficient evidence with which a reasonable jury could find for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Furthermore, bearing in mind that all uncertainties are to be resolved in favor of the nonmoving party, a factual dispute is only "material" if it might affect the outcome of the case. Id. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325, 106 S.Ct. at 2554. After the moving party has met its initial burden, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322, 106 S.Ct. at 2552.

## III. Discussion

Defendant contends that Plaintiff cannot establish a prima facie case of discrimination on the basis of age, sex or disability. Alternatively, Defendant contends that even if

Plaintiff does establish a *prima facie* case for age, sex and disability discrimination, those claims still fail because she is unable to rebut successfully Defendant's contention that Plaintiff's intended transfer was motivated solely by economic considerations.

## A. Prima Facie Case

### 1. ADEA and Title VII

To establish a *prima facie* case under the ADEA, Plaintiff has the initial burden of proving by a preponderance of the evidence that: (1) she was above the age of 40; (2) she was qualified for the position; (3) she suffered an adverse employment decision and; (4) she was replaced by a sufficiently younger person to create an inference of age discrimination. *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 2611, 132 L.Ed.2d 854 (1995) (citation omitted). Defendant concedes that Plaintiff meets prongs (1) and (2) but argues that she is unable to meet prongs (3) and (4). (*See* Def.'s Mem. Supp. Mot. Summ. J. at 12) ("Def.'s Mem.").

With regard to the third prong under the ADEA, Defendant argues that Plaintiff's move to the AIP Unit was not a demotion, citing the fact that her salary would have remained the same. (*See* Def.'s Mem. Ex. A ¶ 21). Plaintiff responds that her salary would have been the same only in the first year. Specifically, she notes that because her salary grade went from 17 to 16, after that first year in the AIP Unit she would have actually experienced a salary decrease relative to what she would have made had she remained in the position of Home Office Consultant (Property). (*See* Pl.'s Mem. Opp'n Mot. Summ. J. Ex. A at 44–46) ("Pl.'s Mem."). Plaintiff further contends that in the new post, her "visibility" and "advancement opportunities" would have been more limited, as she was to be physically relocated from the Home Office, *i.e.*, headquarters, to one of the "regions." (*Id.* at 44). Finally, Plaintiff characterized the transfer as a move from "handling multi-million dollar claims" to claims that "had limits of liability of $15,000," (*id.* at 45), and described the tasks she would have performed in the AIP Unit as "entry level." (*Id.* at 44). In light of this conflicting

evidence, I cannot conclude as a matter of law that Plaintiff's intended transfer to the AIP Unit was not a demotion.

■ With regard to the fourth prong, Plaintiff states that "her position was offered to the younger males, Tom Kelly, Greg Hines, and Bob Wright." (Pl.'s Mem. at 4). Defendant, however, submits a sworn affidavit by Kathryn McMaster, Defendant's Vice President of Human Resources, that two of the three alleged replacements were either older than Plaintiff—Mr. Wright is 55—or the same age—Mr. Hines is 49. (Def.'s Reply to Pl.'s Mem. Opp'n Mot. Summ. J. Ex. A) ("Def.'s Reply"). The only remaining question is whether Mr. Kelly, who was 39 at the time, *id.*, was offered the job of Home Office Consultant (Property). Mr. Ackroyd has submitted a sworn affidavit stating that Defendant "made no effort to find a replacement for Doreene Masonheimer in the position of Home Office Consultant (Property), nor has it looked to hire anyone to perform the responsibilities previously performed by Ms. Masonheimer as the Home Office Consultant (Property)." (Def.'s Mem. Ex. A ¶ 26).

■ During deposition, Plaintiff stated that Ms. Bingham told her that the position of Home Office Consultant (Property) had, in fact, been offered to Mr. Kelly. (Def.'s Reply Ex. B at 75–76). Defendant, however, objects to the use of this deposition testimony for purposes of the instant Motion on the grounds that it is hearsay, citing Fed. R.Civ.P. 56(e) ("Rule 56(e)"), which states, in part, that, in the context of a summary judgment motion, "[s]upporting ... affidavits ... shall set forth such facts as would be admissible in evidence...." Notwithstanding the fact that by its express terms Rule 56(e) only applies to affidavits, the evidentiary admissibility requirement of Rule 56(e) has been extended to depositions as well. *In Re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 770 (3d Cir.1994) (citing, *inter alia*, Rule 56(e) and stating that "hearsay testimony is insufficient to survive a motion for summary judgment"), *cert. denied*, — U.S. —, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995); *Clark v. Clabaugh*, 20 F.3d 1290, 1294 (3d Cir.1994)

(stating "affidavits in support of summary judgment can be opposed by any *admissible* evidence") (emphasis added and citation omitted); *Skillsky v. Lucky Stores, Inc.*, 893 F.2d 1088, 1091 (9th Cir.1990) (remarking that "[l]ike affidavits, deposition testimony that is not based on personal knowledge and is hearsay is inadmissible and cannot raise a genuine issue of material fact sufficient to withstand summary judgment") (citation omitted). Plaintiff offers no argument as to why Ms. Bingham's utterance should be admitted. Therefore, Plaintiff has failed to establish a *prima facie* case as to prong four of the ADEA.[1]

### B.  ADA

To qualify for protection against discrimination under Title I of the ADA, a plaintiff must prove that he or she is a "qualified person with a disability who, with or without reasonable accommodation, can perform the essential functions of the job." 42 U.S.C. §§ 12111(8), 12112(a). Accordingly, a person unable to work is not intended to be, and is not, covered by the ADA.

*McNemar v. The Disney Store*, 91 F.3d 610, 618 (3d Cir.1996), *cert. denied*, — U.S. —, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997). The *McNemar* plaintiff was estopped from asserting in the context of his ADA claim that he met the "qualified person" threshold because he had previously asserted in applications for state and Social Security disability benefits, and for exemption from repayment of educational loans, that he had been totally disabled and unable to work at least five weeks before his discharge. 91 F.3d at 617. The doctrine of judicial estoppel is designed

to protect the integrity of the courts by preventing parties from "assert[ing] a position in this proceeding inconsistent with the one they previously asserted." *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121 (3d Cir.1992), *cert. denied*, 507 U.S. 1005, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993) (citations omitted). The test for the application of the judicial estoppel doctrine is twofold: "(1) [i]s the party's present position inconsistent with a position formerly asserted? (2)[i]f so, did the party assert either or both of the inconsistent positions in bad faith?—*i.e.*, with intent to play fast and loose with the court?"[2] *McNemar*, 91 F.3d at 618 (citation and internal quotation marks omitted).

Defendant, relying on *McNemar*, argues that Plaintiff is judicially estopped from asserting that she "can perform the essential functions of the job" because she previously represented that she is totally disabled and has been unable to work. On July 18, 1994, in connection with her claim for short-term disability benefits, Plaintiff represented that as of July 6, 1994, she was "unable to work" due to her disability. (Def.'s Mem. Ex. C). Similarly, on December 15, 1994, in connection with her claim for long-term disability benefits, Plaintiff represented that as of July 8, 1994 she was "unable to work." (Def.'s Mem. Ex. D at 1). Finally, in her Claim Petition for Worker's Compensation submitted to the Commonwealth of Pennsylvania on June 5, 1995, Plaintiff represented that her condition reached "the point of total disability," (Def.'s Mem. Ex. G at 1), and that she was seeking payment for lost wages on the basis of "full disability from 7–3–94." (*Id.* at 2). Printed on the Claim Petition for the Worker's Compensation form just above the

---

1. Plaintiff has also failed to establish a *prima facie* case under Title VII. To establish a *prima facie* case for gender discrimination under Title VII, Plaintiff has the initial burden here of proving by a preponderance of the evidence that: (1) she belonged to a protected category; (2) she was qualified for the position of Home Office Consultant (Property); (3) her move to the AIP Unit was a demotion; (4) the Home Office Consultant (Property) position was offered to a male employee. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). Again, Defendant has conceded prongs one and two. The Court's analysis under the third prong of the ADEA, *supra*, applies equally to the third prong of Title VII. As to the

fourth prong, the deposition testimony offered by Plaintiff designed to prove that Messrs. Hines and Wright were offered her old position, fails to accomplish this objective. (*See* Pl.'s Mem. Ex. A at 88). The Court's treatment of the fourth prong of the ADEA as it relates to Mr. Kelly applies with equal force to the fourth prong of Title VII.

2. *McNemar* provides little or no guidance as to the requisite analysis under the second prong of the judicial estoppel test. Rather, in *McNemar*, the Third Circuit appears to infer satisfaction of the second prong once the first is met.

entry-box labelled "[f]ull disability from _____," which entry-box Plaintiff checked, is another labelled "[p]artial disability from _____." The juxtaposition of these two entry-boxes suggests that Plaintiff had the opportunity to indicate that she was less than fully disabled.

I am convinced that Plaintiff's present position made in connection with her ADA claim, "that at all material times [s]he was able to perform the essential functions of [her] job, with or without accommodation," *McNemar*, 91 F.3d at 618, is inconsistent with her previous representations to the contrary, made on three separate occasions over the course of 11 months. Therefore, judicial estoppel is appropriate, and Plaintiff is unable to establish a *prima facie* case under the ADA. *Id.* at 619.

### C. Burden of Production

Assuming that Plaintiff had succeeded in establishing a *prima facie* case on any of her claims, "the burden of *production* shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employee's" demotion. *Fuentes*, 32 F.3d at 763 (citation and internal quotation marks omitted). "The employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision." *Id.* (citation omitted). Defendant has met this burden. In an affidavit submitted in support of the instant Motion, Mr. Ackroyd proffers the following nondiscriminatory reason for transferring Plaintiff to the AIP Unit:

> [p]rior to 1991, there were three Home Office Property Claims Examiners handling homeowner claims. When [Ms.] Bingham became Home Office Director of Property Claims in and around 1992, the two remaining Home Office Property Claims Examiners reported to her, one of whom was [Plaintiff].

> [i]n late 1993, [Ms.] Bingham left her position as Director of Home Office Property

Claims to set up, organize and manage the ... [AIP] Unit, a new department.

> [w]hen [Ms.] Bingham left the position of Home Office Director of Property Claims, [Plaintiff], a Home Office Senior Claims Examiner, was the only remaining examiner for homeowner property claims. The other two homeowner property examiners had left through attrition and were not replaced due to the declining volume of homeowner business.

*       *       *

> [d]uring late 1993 and 1994, [Plaintiff's] title was changed from Senior Property Claims Examiner to Home Office Consultant (Property) and she remained in the Home Office in Norristown, Pennsylvania.

> [c]laims referred to the Home Office arising from Colonial Penn's homeowner property business, always a minor part of its operations,[3] declined to the point in June 1994 that it no longer made business sense for Colonial Penn to have a Home Office position dedicated to homeowner property claims.

(Def.'s Mem. Ex. A ¶¶ 8–10, 15 and 16).

Defendant explains that it "decided to eliminate the position of Home Office Consultant (Property) and to shift responsibility for auditing homeowner claims handling to the field offices in Colonial Penn's three regions." (Def.'s Mem. Ex. A ¶ 17). This non-discriminatory reason for the transfer mirrors the contemporaneous explanation given by Mr. Ackroyd, in memorandum form, to Plaintiff on June 28, 1994 as the explanation for her transfer to the AIP Unit:

> [t]he decision to [transfer Plaintiff] is based on a continuing low volume of property referrals into the Home Office, a low Home Office referral pending count (40–50 files) and the staffing of Consultant positions in the field offices.... [T]he factors mentioned above have influenced the decision to make this change in the Home Office. Additionally, the growth we are experiencing in the Eastern Region neces-

---

**3.** "[Defendant] and its subsidiaries are personal lines insurance companies, with their principal business (approximately 92%) in automobile in-surance, and the remaining component (8%) split among homeowner, umbrella and health insurance." (Def.'s Mem. Ex. A ¶ 2).

sitates the addition of a Consultant with heavy casualty experience.

(Pl.'s Mem. Ex. C at 2). In short, Defendant submits that its decision to transfer Plaintiff resulted from a process of gradual restructuring and decentralization in response to changes in the insurance business environment. This explanation satisfies Defendant's "relatively light burden," *Fuentes*, 32 F.3d at 763, of production and the burden now shifts back to Plaintiff.

At this point, to survive summary judgment, Plaintiff must either:

> (i) [ ] present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon [Defendant's] proffered reasons for [the demotion] (e.g., by painting them as weak, implausible, contradictory or incoherent), or; (ii)[ ] come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (e.g., by showing that the employer in the past had subjected [her] to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of [her] protected class more favorably, or that the employer has discriminated against other members of [her] protected class or other protected categories of persons).

*Fuentes*, 32 F.3d at 765.[4]

■ Plaintiff cites an entry from Defendant's 1993 Strategic Statement which identified a "[y]ounger work-force" as a "positive" that "had previously been identified as impacting on the successful operation of Colonial Penn" as rebuttal evidence. (Pl.'s Mem. Ex. D at 2–1, 2–3). Plaintiff notes that senior management played a central role in drafting the 1993 Strategic Statement and that it "created a policy or environment in which older employees were seen as less

desirable than younger employees." (Pl.'s Mem. at 8). A single, stray entry in the 1993 Strategic Statement, not specifically directed at Plaintiff and made almost one year before the adverse employment action, however, neither "meaningfully throws into question" Defendant's proffered reasons for the demotion nor provides a basis upon which a "factfinder could reasonably conclude than an illegitimate factor more likely than not was a motivating factor" behind the demotion. Were Plaintiff merely required to proffer a *scintilla* of evidence to carry its burden of production at this point, the suspect entry in the 1993 Strategic Statement, standing alone, as it does, might have been sufficient. The *Fuentes* standard, however, is more exacting than that. Therefore, Plaintiff's ADEA claim would not survive summary judgment even if she had established a *prima facie* case.

■ With regard to her Title VII claim, Plaintiff submits that "32% of the employees initially assigned" to the AIP Unit were "female over 40 years of age." (Pl.'s Mem. at 8) (citing Pl.'s Mem. Ex. G). This fact, however, is of dubious significance because, in the first instance, Plaintiff conflates the characteristics of "femaleness" and "age" into the same statistic, a circumstance which impedes the Court from drawing any inference about the gender make-up of the entire AIP Unit regardless of age. Furthermore, even if it were the case that 1/3 of all employees in the AIP Unit were female, rather than just those over 40, this fact alone would be insufficient to support an inference that the AIP Unit was "stacked" with women and that, therefore, the transfer of female employees thereto was motivated by considerations of gender. It may be that every unit in Defendant is approximately 1/3 female which if true, would discredit the notion that the AIP Unit was a "dumping ground" for women employees. Thus, the "32%" figure, in isolation, is hardly probative.

---

4. Put another way,
> [t]he district court must determine whether the plaintiff has cast sufficient doubt upon the employer's proffered reasons to permit a reasonable factfinder to conclude that the reasons are incredible. . . . [O]nce the court is satisfied that the evidence meets this threshold require-

> ment, it may not pretermit the jury's ability to draw inferences from the testimony, including the inference of intentional discrimination drawn from an unbelievable reason proffered by the employer.

*Sheridan v. E.I. DuPont de Nemours and Co.*, 100 F.3d 1061, 1072 (3d Cir.1996).

Plaintiff notes that "[a]dditional evidence of sex discrimination ... was her supervisor's refusal to provide her" with benefits given to personnel with "Plaintiff's salary grade for travel they did to disaster areas." (Pl.'s Mem. at 8–9). The deposition testimony cited by Plaintiff to bolster this statement, however, is weak. In response to the question whether Plaintiff was given the catastrophic pay requested, Ms. Bingham replied that "I honestly don't remember whether she got it or not. I know there was a dispute whether she should get it or not." (Pl.'s Mem. Ex. E at 34). Even assuming it to be true that Plaintiff had been denied those benefits, the only evidence linking that denial to Plaintiff's gender is Ms. Bingham's recollection that some of those who did receive the benefit in question were men. (*See* Def.'s Mem. Ex. E at 34–35). Critically absent is any evidence, however slight, of a *causal* link between the denial of the benefit and Plaintiff's gender. In sum, an isolated, non-comparative statistic stating the percentage of the AIP Unit that was both female and above the age of 40, combined with the denial of catastrophic pay benefits to Plaintiff, neither sufficiently impugns Defendant's proffered reasons for the demotion nor provides a basis upon which a "factfinder could reasonably conclude than an illegitimate factor more likely than not was a motivating factor" behind the demotion. Therefore, Plaintiff's Title VII claim fails irrespective of whether she established a *prima facie* case.[5]

An appropriate Order follows.

### ORDER

**AND NOW,** this 15th day of April, 1997, upon consideration of Defendant's Motion for Summary Judgment and Memorandum in support thereof (Doc. No. 20), Plaintiff's Motion for Order Denying Defendant's Motion (Doc. No. 25), and Defendant's Reply (Doc. No. 26), **IT IS HEREBY ORDERED THAT:**

1. Defendant's Motion for Summary Judgment **IS GRANTED**.

2. Defendant's Motion to Strike Plaintiff's Proposed Experts (Doc. No. 24) **IS DISMISSED AS MOOT**.

3. Judgment SHALL BE ENTERED in favor of DEFENDANT and against **PLAINTIFF**.

4. The Clerk of Court SHALL MARK this case **CLOSED**.

5. Even if Plaintiff were not judicially estopped from establishing a *prima facie* case in connection with her ADA claim, that claim would still not survive the instant Motion as Plaintiff has adduced no evidence to rebut Defendant's legitimate nondiscriminatory rationale for the AIP Unit transfer. *See McNemar*, 91 F.3d at 619 ("[i]n adjudicating cases brought under the ADA ... courts apply the burden-shifting framework applicable to cases brought under Title VII...."); *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 68–69 (3d Cir.1996) (applying ADEA burden shifting analysis to ADA claim); *Newman v. GHS Osteopathic, Inc.*, 60 F.3d 153, 157 (3d Cir.1995) (explaining the methods of proof applicable in other discrimination contexts, such as those involving Title VII and the ADEA, also apply in an action brought under the ADA); *Ennis v. Nat'l Ass'n of Bus. and Educ. Radio, Inc.*, 53 F.3d 55, 57–58 (4th Cir. 1995) (holding that Title VII burden-shifting rules apply in ADA pretext case).